2018 PA Super 106

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BRIAN LEE THRAN | : | |
| | : | |
| Appellant | : | No. 1155 MDA 2017 |

Appeal from the Judgment of Sentence July 3, 2017
In the Court of Common Pleas of York County
Criminal Division at No(s):  CP-67-CR-0006925-2016

BEFORE:  SHOGAN, J., LAZARUS, J., and OTT, J.

OPINION BY OTT, J.:                                                        **FILED MAY 02, 2018**

Brian Lee Thran appeals from the judgment of sentence imposed on July 3, 2017, in the Court of Common Pleas of York County, following his conviction at a bench trial on four counts of driving under the influence (DUI).[1]  In this timely appeal, Thran argues the trial court erred in failing to suppress the physical evidence.  Thran asserts said evidence was improperly obtained after he was subjected to an investigative detention that was not supported by a reasonable suspicion of criminal activity.  After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

---

[1] The main count, Count 4, was DUI: Highest Rate of Alcohol (BAC .16+), 2nd Offense, 75 Pa.C.S. § 3802(c).  All counts were under various subsections of Section 3802.  Thran was sentenced to five years of intermediate punishment, the first year of which to be served in the York County Prison. We note that in addition to having a blood alcohol content (BAC) of .184, the chemical analysis of his blood also indicated Thran had trace amounts of morphine (51 ng/mL) and oxycodone (34 ng/mL).

The underlying facts of this matter are taken from the trial court opinion dated September 29, 2017 and the notes of testimony of the suppression hearing held on February 17, 2017.

On September 17, 2016, Northern York County Regional Police Officer (NYCRP) Patrick McBreen was working the night shift. N.T. at 5-6.

> At 2304 hours (11:04 p.m.), a call was made to York County Control from a named citizen (Justin Baugherman).[2] The call was dispatched to the Officer and the following information was obtained from the caller:
>
> - Mr. Baugherman observed a male riding a black Harley Davidson motorcycle; and
>
> - The male was wearing a black leather jacket; and
>
> - The motorcycle was swerving all over the road and passing over the white line; and
>
> - The motorcycle was traveling north on Orchard Road, made a right onto Lincoln Highway, and pulled into Hartlob's Garage at the corner of Orchard Road and Lincoln Highway on Rt. 30; and
>
> - Mr. Baugherman made the call to 911 because he was concerned for the individual's safety.
>
> The Officer arrived at the location provided by the caller (Hartlob's Garage) only eight (8) minutes after receiving the call. The Officer observed a black Harley Davidson motorcycle, and a male wearing a black leather jacket leaning on the motorcycle. Hence, the location given in the call, the description of the vehicle, and the description of what the individual was wearing were all corroborated. The Officer further testified that he had a duty to

---

[2] The notes of testimony and trial court opinion indicate the witness's name is Baugherman. However, the certified record indicates the name is actually Justin Wagaman. It appears Mr. Wagaman, and his wife, were subpoenaed to appear at the trial before the District Justice. *See* NYCRPD Witness List.

investigate and therefore approached [the driver of the vehicle]. Officer McBreen could not recall whether he had activated his overhead lights, but he indicated they may have been on.

Trial Court Opinion at 2-3 (citations to N.T. omitted).

We further note that Officer McBreen testified the garage was closed and there were no other cars around at time of his interaction with Thran. N.T. at 30.

The standard of review for an order denying a suppression motion is as follows:

> In reviewing the denial of a suppression motion, our role is to determine:

>> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

> *Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (2010) (internal quotations and citations omitted). Our scope of review is limited to the evidence presented at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073, 1080 (2013).

*Commonwealth v. Mackey*, 177 A.3d 221, 226 (Pa. Super. 2017).

- 3 -

Because this matter also involves a claim of improper search and

seizure, we also consider the factors that delineate the differences

between a mere encounter and an investigative detention.[3]

> The investigation of possible criminal activity invariably brings
> police officers in contact with members of the public. Depending
> on the circumstances, a police-citizen encounter may implicate the
> liberty and privacy interests of the citizen as embodied in both the
> federal constitution, *see* U.S. Const. art. IV, and our state
> constitution, *see* Pa. Const. art. I, § 8. The law recognizes three
> distinct levels of interaction between police officers and citizens:
> (1) a mere encounter; (2) an investigative detention, often
> described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88
> S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) a custodial detention.
> *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super.
> 2005).
>
> "A mere encounter can be any formal or informal interaction
> between an officer and a citizen, but will normally be an inquiry
> by the officer of a citizen. The hallmark of this interaction is that
> it carries no official compulsion to stop or respond,"
> *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super.
> 2000)(internal citations and quotations omitted), and therefore
> need not be justified by any level of police suspicion.
> *Commonwealth v. Polo*, 563 Pa. 218, 759 A.2d 372, 375
> (2000).
>
> "In contrast, an 'investigative detention' ... carries an official
> compulsion to stop and respond .... Since this interaction has
> elements of official compulsion it requires reasonable suspicion of
> unlawful activity." *DeHart*, 745 A.2d at 636. In addition, while
> reasonable suspicion of unlawful activity is sufficient to justify a
> forcible **stop**, it does not necessarily justify a **frisk** for weapons.
> *See Commonwealth v. Davis*, 102 A.3d 996, 999 (Pa. Super.
> 2014) ("A *Terry* frisk is a type of investigative detention requiring
> reasonable suspicion that criminal activity is afoot **and** that the
> individual whose suspicious behavior he is investigating at close

---

[3] The third level of interaction between the police and a citizen, custodial detention, is not at issue.  Therefore, we need not relate the law as it applies to that interaction.

range is armed and presently dangerous to the officer or to others.") (internal quotation marks omitted, emphasis added). Only when the officer reasonably believes the suspect may be armed and dangerous is a weapons frisk appropriate. *See Commonwealth v. Pinney*, 474 Pa. 210, 378 A.2d 293, 296 (1977)("[I]n the case of a self-protective search for weapons, a police officer must be able to point to particular facts from which he could reasonably infer that the individual was armed and dangerous.").

*Id*. at 226-27 (footnotes omitted) (emphasis in original).

Thran argues that he was subjected to an investigative detention at the time Officer McBreen turned on his overhead emergency lights. Further, the tip Officer McBreen responded to was insufficient to support the investigative detention.

We begin by noting that the trial court did not make a specific factual finding that Officer McBreen activated his overhead emergency lights. As quoted above, the trial court noted that Officer McBreen indicated his lights might have been on. However, we accept that the lights were activated as a fact because the trial court's analysis does not address the scenario where the lights were not activated. All parties agree that if Officer McBreen did not activate his overhead emergency lights, the encounter between Thran and Officer McBreen would have been a mere encounter and the suppression of evidence would not be warranted. If the trial court determined that the overhead emergency lights had not been activated, the trial court would have simply resolved the matter on those grounds. Because the trial court did not

do so, and fully analyzed the issue under the premise that the overhead emergency lights were activated, we accept that as a fact.

Whether the overhead emergency lights were activated is important because case law on this issue has changed from the time of the suppression hearing to today.[4] In November, 2017, our Supreme Court issued its decision in *Commonwealth v. Livingstone*, 174 A.3d 609 (Pa. 2017). In that decision, the Supreme Court held that when the police activate the overhead emergency lights, no reasonable person would believe he or she was free to leave. Accordingly, the person is subject to an investigative detention when the lights are activated. Specifically, *Livingston* stated:

> It is undeniable that emergency lights on police vehicles in this Commonwealth serve important safety purposes, including ensuring that the police vehicle is visible to traffic, and signaling to a stopped motorist that it is a police officer, as opposed to a potentially dangerous stranger, who is approaching. *See Johonoson*, 844 A.2d at 562. Moreover, we do not doubt that a reasonable person may recognize that a police officer might activate his vehicle's emergency lights for safety purposes, as opposed to a command to stop. Nevertheless, upon consideration of the realities of everyday life, particularly the relationship between ordinary citizens and law enforcement, we simply cannot pretend that a reasonable person, innocent of any crime, would not interpret the activation of emergency lights on a police vehicle as a signal that he or she is not free to leave.

*Id.*, 174 A.3d at 621.

---

[4] The issue of overhead emergency lights was raised at the suppression hearing and has been preserved throughout the course of this appeal. Accordingly, Thran is entitled to the application of developing case law on the issue.

- 6 -

After citing relevant portions of the Pennsylvania Driver's Manual and Motor Vehicle Code, our Supreme Court continued:

> The fact that motorists risk being charged with violations of the Motor Vehicle Code if they incorrectly assume they are free to leave after a patrol car, with its emergency lights activated, has pulled behind or alongside of them further supports our conclusion that a reasonable person in Appellant's shoes would not have felt free to leave.

*Id*. at 622.[5]

Accordingly, pursuant to **Livingstone**, once Officer McBreen activated his overhead emergency lights, Thran was subjected to an investigatory detention. We must now examine whether that detention was supported by a reasonable suspicion of criminal activity. If so, then the detention was justified and Thran's argument is unavailing.

Here, the police received a phone tip from an identified caller. The caller reported that he was witnessing erratic driving that placed, minimally, that driver in jeopardy. Additionally, the description of the motorcycle's actions provided ample suspicion of impaired driving. The caller provided a description of the driver and specifically identified the type of motorcycle being operated. Finally, the caller informed the police where this erratic driving was taking place and where the motorcycle had driven. Upon arriving at the

---

[5] It appears that **Livingstone** has overruled *sub silencio* **Commonwealth v. Johonoson**, 844 A.2d 556 (Pa. Super. 2004) and subsequent cases such as **Commonwealth v. Conte**, 931 A.2d 690 (Pa. Super. 2007) and **Commonwealth v. Kendall**, 976 A.2d 503 (Pa. Super. 2009).

location identified by the caller a mere eight minutes following the call, Officer McBreen witnessed the identified brand of motorcycle and, there being no other people nearby,[6] the presumed driver. The driver was wearing a leather jacket as described by the caller. The trial court noted that Officer McBreen corroborated all the information provided by the caller.

The trial court relied upon *Commonwealth v. Collazo*, 692 A.2d 1116 (Pa. Super. 1997), in support of its holding that the tip from the identified caller provided Officer McBreen with the reasonable suspicion sufficient to justify the investigative detention. We agree.

> The court noted that an officer need not personally observe suspicious activity in order to conduct an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances." [*In the Interest of*] *S.D.*, *supra* [479 Pa. Super. 576] at 580, 633 A.2d [172] at 174. Further, the stop in *S.D.* was supported by the relevant factors to be considered in such cases, namely, the specificity of the description, the proximity of the crime to the sighting of the suspect, the time and place of the confrontation and the nature of the offense. *Id.*
>
> Here, Officer LaCombe received a face-to-face citizen's complaint of a crime in progress. When he promptly arrived at the location, the officer observed appellant, matching exactly the detailed description given by the citizen. Officer LaCombe then approached appellant and began speaking with him about the information he had received. Under the authority of *S.D.,* the initial stop and questioning of appellant was proper. *See also Commonwealth v. Stokes*, 480 Pa. 38, 389 A.2d 74 (1978) (victim and eyewitness information regarding the commission of a crime sufficient to establish probable cause); *Commonwealth v. Hamme*, 400 Pa.Super. 537, 583 A.2d 1245 (1990)(police can rely on

---

[6] Additionally, there were no other vehicles. N.T. at 30.

"information from other officers or citizen witnesses;" officer made valid *Terry* stop based on other officer's observation of suspect's erratic driving).

We caution that the authority of a police officer in these circumstances is limited. He or she is permitted only to "approach and briefly detain" a potential suspect "for investigatory purposes." *Commonwealth v. Arch*, 439 Pa.Super. 606, 654 A.2d 1141, 1143 (1995). In *Arch,* this court noted that while an officer is prohibited from relying on an "unparticularized suspicion" or a "hunch" as a basis for a *Terry* stop, he or she may rely on a police radio broadcast if the suspect matches the specific description given by the individual who reported the crime. *Id.* at 612-14, 654 A.2d at 1144 (citing *Commonwealth v. Prengle*, 293 Pa.Super. 64, 437 A.2d 992 (1981)).

Conversely, a "common report" is insufficient to support an investigatory stop. In *Commonwealth v. Williams*, 298 Pa.Super. 466, 444 A.2d 1278 (1982), neighborhood residents informed a police officer that a particular individual was a known "bicycle thief" who had in his possession some bicycles he had stolen. When the officer later saw the individual riding a bike, he made a *Terry* stop to investigate the matter. This court held that the information from the citizens was insufficient to cause the officer to believe that criminal activity was afoot. The lack of a specific crime report was fatal in *Williams.*

**A detailed citizen's report of a specific crime in progress is appropriately addressed by a prompt investigatory stop**; general information to police about a person who has broken the law in the past is not. Further, the intrusion of which appellant complains is not overly burdensome since, as in all *Terry* stops, the "suspect's expectation of privacy is not sufficiently infringed by the minimal intrusion attendant to an investigatory stop." *Commonwealth v. Epps*, 415 Pa.Super. 231, 608 A.2d 1995, 1096 (1992).

*Commonwealth v. Collazo*, 692 A.2d at 1118-19 (emphasis added).

We believe that the instant facts are sufficiently similar to *Collazo*.

Therefore, we find that Officer McBreen possessed a reasonable suspicion of

criminal activity that supported the investigative detention. Because the

investigative detention was proper, Thran's argument is unavailing and he is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/2/2018